UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MONARCH INVESTMENTS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| ELIAS V. LORENZANA, JR., FERNANDO | § | |
| AURRECOECHEA, ALEJANDRO | § | |
| AURRECOECHEA, WAYNE CADENA, | § | **Case No. 14-1019** |
| CANDICE AGUIRRE, NASH MARTINEZ, | § | |
| LUCY CADENA, LORENZANA & SARHAN, | § | **JURY TRIAL DEMANDED** |
| INC., THE LORENZANA LAW FIRM, PC, | § | |
| KHALED M. SARHAN, ELIAS J. LORENZANA, | § | |
| M.D., LORENCO, INC., TEXAS ECONOMIC | § | |
| REGIONAL CENTER HOLDING COMPANY, | § | |
| LLC, and UNITED PILLARS GROUP, LLC | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Monarch Investments, LLC ("Monarch"), individually and derivatively on behalf of Wellness Med Clinics, LLC, complains of Elias V. Lorenzana, Jr., Fernando Aurrecoechea, Alejandro Aurrecoechea, Wayne Cadena, Candice Aguirre, Nash Martinez, Lucy Cadena, Lorenzana & Sarhan, Inc., The Lorenzana Law Firm, PC, Khaled M. Sarhan, Elias J. Lorenzana, M.D., Lorenco, Inc., Texas Economic Regional Center Holding Company, LLC, and United Pillars Group LLC, as follows:

**I.  THE PARTIES**

1.      Monarch is a Texas limited liability company.

2.      Fernando Aurrecoechea is an individual residing in Texas who may be served with process at his usual place of business, Wellness Med Clinic, 5510 S. IH 35, Suite 250,

Austin, Texas  78745; at his usual place of abode at 1303 E Main St., Apt. A, Round Rock, Texas  78664, or wherever he may be found.

3.      Alejandro Aurrecoechea is an individual residing in Texas who may be served with process at his usual place of business, Wellness Med Clinic, 5510 S. IH 35, Suite 250, Austin, Texas  78745; at his usual place of abode at 1303 E Main St., Apt. A, Round Rock, Texas  78664, or wherever he may be found.  Fernando and Alejandro Aurrecoechea shall be referred to collectively as the "Aurrecoecheas."

4.      Wayne Cadena ("Cadena") is an individual residing in Texas who may be served with process at his usual place of business, Wellness Med Clinic, 5510 S. IH 35, Suite 250, Austin, Texas  78745; at his usual place of abode at 715 W. Slaughter Lane, Apt. 127, Austin, Texas  78748, or wherever he may be found.

5.      Elias V. Lorenzana, Jr. ("Lorenzana Jr.") is an individual residing in Travis County, Texas who may be served with process at his usual place of place of business at 7600 Burnet Road, Suite 515, Austin, Texas  78757, or wherever he may be found.

6.      Lorenzana & Sarhan, Inc. ("L&S") is a Nevada Corporation doing business as a law firm in Texas.  L&S may be served with process upon its registered agent for service of process in Texas, Khaled M. Sarhan, 7600 Burnet Road, Suite 515, Austin, Texas  78757, or wherever he may be found.

7.      The Lorenzana Law Firm, PC ("Lorenzana Firm") is a Texas Professional Corporation doing business as a law firm in Texas.  The Lorenzana Firm may be served with process upon its registered agent for service of process in Texas, Lorenzana, Jr., 1008 Ranch Road 620 South, Suite 102, Austin, Texas  78734, 7600 Burnet Road, Suite 515, Austin, Texas 78757, or wherever he may be found.

2

8.     Khaled M. Sarhan ("Sarhan") is an individual residing in Texas who may be served with process at his usual place of place of business at 7600 Burnet Road, Suite 515, Austin, Texas  78757, or wherever he may be found.

9.     Candice Aguirre ("Aguirre") is an individual residing in Buda, Texas who may be served with process at 302 Clarence Court, Buda, Texas 78610 or wherever she may be found.

10.     Lucy Cadena ('Ms. Cadena") is an individual residing in Texas who may be served with process at her usual place of business, Wellness Med Clinic, 5510 S. IH 35, Suite 250, Austin, Texas  78745; at her usual place of abode at 908 Poplar St., Austin, Texas  78705.

11.     Nash Martinez ("Martinez") is an individual residing in Texas who may be served with process at his usual place of abode, 6903 Edinburgh Cove, Austin, Texas  78749, or wherever he may be found.

12.     Elias J. Lorenzana, M.D. ("Dr. Lorenzana") is an individual residing in Bexar County, Texas who may be served with process at his business address of 8530 Village Dr, San Antonio, Texas 78217.

13.     Lorenco, Inc. ("Lorenco") is a Texas corporation and may be served by serving its registered agent with the State of Texas: Dr. Lorenzana at 1230 Austin Highway, Suite 101, San Antonio, Texas 78209, 8530 Village Dr, San Antonio, Texas 78217 or wherever he may be found.

14.     Texas Economic Regional Center Holding Company, LLC ("TERC") is a Texas limited liability company and may be served by serving its registered agent with the State of Texas: The Lorenzana Law Firm, P.C. at 6836 Austin Center Blvd., Suite 140, Austin, Texas 78731, 7600 Burnet Road, Suite 515, Austin, Texas  78757, or wherever it may be found.

15.     United Pillars Group LLC ("UPG") is a Texas limited liability company and may be served with service of process through its registered agent with the State of Texas: Lorenzana Jr. at 7600 Burnet Road, Suite 515, Austin, Texas  78757, or wherever he may be found.

## II.  JURISDICTION AND VENUE

16.     Jurisdiction of this Court over these claims and parties is proper pursuant to 28 U.S.C. §1331, as this civil action arises under the federal laws of the United States.  In addition, this Court has subject matter jurisdiction of the state law claims pursuant to 28 U.S.C. §1367 because they are so related to the federal claims in this action that they form part of the same case or controversy.   Jurisdiction is additionally proper pursuant to Section 22(a) of the Securities Act of 1933 (15. U.S.C. § 77v(a)) (the "Securities Act") and Section 27 of the Securities Act of 1934 (15 U.S.C. § 78 aa) (the "Exchange Act").

17.     Venue of this civil action is proper in this Court pursuant to 28 U.S.C. §1391 because the defendants reside in this judicial district, and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## III.  FACTUAL BACKGROUND

A.     THE PRIMARY FRAUD PERPETRATORS AND THEIR INITIAL SOLICITATION OF PLAINTIFF'S INVESTMENT

18.     Lorenzana Jr. is a licensed attorney and certified public accountant. His father, Dr. Lorenzana, is a licensed physician who operates a general medical practice (through, upon information and belief, Lorenco). The Aurrecoecheas[1] hold themselves out as successful business professionals in the Austin, Texas area–having experience in managing or operating multi-clinic healthcare facilities, including most recently Union Treatment Centers.

---

[1]     Fernando Aurrecoechea is Alejandro Aurrecoechea's father.

4

19.     In June 2012, Lorenzana Jr. established a private company–defendant TERC—to participate in the Immigrant Investor Program, more commonly known as the EB-5 Program, and to operate this entity as a private equity firm.[2] TERC's website at www.texaseb5regionalcenter.com lists Lorenzana Jr. as TERC's managing member.  The Aurrecoecheas are also members of TERC:  its website touts them–along with Lorenzana Jr.–as part of TERC's "EB-5 Texas Team."  The Aurrecoecheas joined forces with Lorenzana Jr. (through TERC) to promote an investment opportunity to Plaintiff in a series of medical clinics to be operated through two newly created entities: Wellness Med Clinics, LLC ("WMC") and Injury 2 Wellness, LLC ("I2W").

20.     Monarch's sole manager and member is Shyam Garg ("Garg"), a retired engineering professional.  In the fall of 2013, defendant Martinez, a prior business acquaintance of Garg, suggested to Garg that he might be interested in meeting with Lorenzana Jr. and others concerning a potential EB-5 Program investment.  At that time, Garg was not actively looking for a potential investment opportunity, but he was open to such a meeting.  As such, Garg agreed to participate in the meeting and the accompanying introduction proposed by Martinez.

21.     Unbeknownst to Garg at the time, Martinez had an undisclosed brokerage arrangement with Lorenzana Jr., TERC or the Aurrecoecheas whereby he would be paid a substantial commission for the successful solicitation of Garg's eventual investment in WMC (through Monarch).  As set forth below, Garg later learned that WMC (presumably at the

---

[2]     The EB-5 Program is a federal visa initiative designed to give foreign investors a legal path to United States residency.  EB-5 Program regional centers are private entities designed to accept and direct investments for foreign nationals into investment opportunities that satisfy the EB-5 visa requirements.  Regional centers are permitted by the United States Citizenship and Immigration Service (USCIS) to charge investors an administrative fee for providing investment opportunities.  To obtain a "Regional Center" designation, a company must provide USCIS with a business plan or other materials demonstrating how the center intends to create the necessary jobs. Upon information and belief, TERC is and was not registered as an approved Regional Center through the EB-5 Program by the USCIS.

request or direction of Lorenzana Jr. and the Aurrecoecheas) paid out an $18,000 commission to Martinez almost immediately upon Monarch's initial investment in WMC.

**B.**   THE INVESTMENT PRESENTATION MEETINGS

22.     On September 10, 2013, Martinez arranged an initial meeting among Lorenzana Jr., the Aurrecoecheas and Martinez at a conference room at the Lorenzana Firm.  During this meeting, Lorenzana Jr. and the Aurrecoecheas presented Garg with a series of potential investment opportunities on TERC's behalf, including several as part of the "EB-5 Program."[3] At this meeting (and in follow up emails to Garg), Lorenzana Jr. and the Aurrecoecheas emphasized their affiliation with TERC to bolster the perception of legitimacy of the potential investment opportunities presented to Garg.

23.     Two of the investment opportunities presented at this initial meeting in which Garg had preliminary interest were an oil well investment and WMC.  Following this meeting, Garg narrowed his focus to the WMC investment opportunity, and (along with his wife) arranged to meet again on October 16, 2013 at the Lorenzana Firm offices with the WMC promoters:   Lorenzana Jr., the Aurrecoecheas, and Martinez.   At this meeting, the Aurrecoecheas presented a power point presentation to Garg and his wife concerning the details of the potential WMC investment.  The Aurrecoecheas (along with Lorenzana Jr.) also provided Garg a written "Business Plan" for WMC, and discussed it at some length.  The Business Plan included the following representations:

- WMC's proposed business was described as "a highly lucrative medical clinic serving Federal and state injured workers, physical rehabilitation as well as private insurance acute minor emergency and family care practice."

---

[3]     Although Garg was philosophically supportive of the EB-5 Program to the extent that it promoted regional economic growth (including the promise of the creation of at least 10 jobs for Texas citizens), the potential investment in an EB-5 program did not provide Garg with immigration incentives or benefits as Garg is a United States citizen.

- The "development stage" of the WMC business project was described as the "expansion of existing medical clinics" founded in 2007 (thereby confirming that WMC was an existing business). The Business Plan further represented that WMC and I2W were "an expansion of operations of the established family medicine practice Lorenco, Inc.," a Texas corporation owned, managed or controlled by Dr. Lorenzana.[4]

- The "Company History" portion of the Business Plan touts Dr. Lorenzana's "established medical practice" which was started in 1989 and had been providing primary family medical care since that time.  The Plan provides a link to Dr. Lorenzana's practice website and a link to his medical practice's services.  It also boasts that Dr. Lorenzana's clinic has an annual revenue rate of approximately $1 million per year and EBITDA of $450,000/year.

- Significantly, Dr. Lorenzana was to be WMC's treating physician and was to be assisted by two employees: a medical assistant and a receptionist.  WMC would also have a Physical Therapy doctor assisted by a certified physician's technologist and a receptionist.

- WMC's management "Team" included Lorenzana Jr. (as CEO and General Manager), Cadena (as COO), Aguirre (as CRO) and Alejandro Aurrecoechea (as CTO).  The Plan provided detailed descriptions of these individual's credentials, experiences and expertise.

- Notably, the Business Plan contains a "Personnel Plan" for WMC and lists WMC's CFO, CMO, COO and CTO as having first year salaries of $55,000 each, along with a bookkeeper at $12,502 (totaling roughly $230,000 of annual salary in the aggregate).  The remainder of the first year salaries included a doctor, physical therapist, physical therapist tech and medical assistant (totaling roughly $270,000 in the aggregate).  No other salaried employees are listed for the first year of WMC's operations.

- WMC's operations were backed by existing "personal guarantees and collateral."

- Financial projections indicated first year revenue of $1.3 million with roughly equivalent offsetting expenses, but the Plan promised a second-year profit of $1.4 million.  In particular, the Plan provided that "[a]t the end of the first year, we expect to incur operating losses as some initial cases start to be paid by the state agencies, but have planned for a strong cash balance to keep the business running.  *We will being making a small profit in the second year.*"

---

[4]     The Texas Secretary of State website confirms that Lorenco is a Texas corporation formed in 1989.  It is apparently managed by Lorenzana Jr.'s father – Dr. Lorenzana.

- WMC listed $50,000 in non-cash assets, a $150,000 "cash balance on starting date" and no liabilities.

- The Plan referred to various financial attachments, including 2011 and 2012 tax returns and revenue statements and revenue figures from 2008 through 2012, but there were no attachments to the Plan.

In addition, the Business Plan lists Lorenzana Jr. and the Lorenzana Firm as the contacts for any investment-related questions.

24.    At no point during this October 16th meeting or at any point before Monarch's investment in WMC did Lorenzana Jr. or the Aurrecoecheas advise Monarch that any of the statements contained in the Business Plan were inaccurate or incomplete, despite the fact that each of these listed statements and representations was false. Based upon their collective review and discussion of the contents of the Business Plan at this meeting, Garg understood that Lorenzana Jr. and the Aurrecoecheas had actual knowledge and ratified and approved of these statements and the Business Plan generally.  As set forth in detail below, Lorenzana Jr. and the Aurrecoecheas knew that essentially all of these representations contained in the Business Plan were false (including some blatant lies), yet they failed to disclose the truth to Monarch.

25.    Also during this October 16th meeting, Lorenzana Jr. told Garg that WMC required an additional $1.2 million investment to realize its growth plans.  When Garg responded that (1) he was not inclined to make a $1.2 million investment and (2) preferred to share the investment (and any associated bargained-for business risk) with other investors, Lorenzana represented that WMC had already obtained $300,000 in committed investor funding from an undisclosed third-party, thereby assuaging Garg's initial concerns about becoming the sole investor for WMC's expansion, and reducing its need to $900,000.  Despite this unequivocal statement, Lorenzana Jr. and the Aurrecoecheas knew that WMC did not have an

additional $300,000 investor at the time of this meeting, and that Lorenzana Jr.'s representation to Garg was false and made to induce Garg's investment decision.

26.     Lorenzana and the Aurrecoecheas made these various representations about WMC (set forth expressly in the Business Plan and verbally during the October 16th meeting) with the intent of inducing Garg to cause Monarch to invest in WMC.  As set forth herein, Lorenzana Jr. and the Aurrecoecheas had no intention at the time to utilize Monarch's substantial investment for its intended and represented purposes, but instead planned to use those funds for their own personal benefit.

## C.     PLAINTIFF'S INVESTMENT

27.     Garg justifiably relied upon these various disclosures and representations and ultimately agreed (through Monarch, his wholly-owned LLC) to invest $900,000 in WMC. This sizable investment represented a substantial part of his family's life savings, earned by Garg and his wife over a 25 year period.  To memorialize Monarch's investment, on October 21, 2013, Lorenzana Jr. (purportedly acting on behalf of WMC and its existing members) presented Garg with a draft "Member Acquisition Agreement" (the "Acquisition Agreement").[5] Ultimately, Monarch executed the Acquisition Agreement, and beginning on October 22, 2013 made a series of three deposits over the course of a week in the aggregate amount of $900,000 representing its investment in WMC.  In exchange for this investment, Monarch was promised 35% of WMC (which was opening a new Austin location) and 5% in a similar clinic to be

---

[5]     The draft of the Acquisition Agreement made reference to a July 1, 2013 Operating Agreement for WMC that was supposedly attached to the Acquisition Agreement.  It was not.  When Garg asked for a copy of it, Lorenzana Jr. agreed to provide it but never did.

located in San Antonio, Texas.[6]  Although Monarch did not want or expect to have any control over WMC's day-to-day business affairs, there was never any discussion of these membership interests having anything other than full voting rights in WMC.

D.   DEFENDANTS' POST-INVESTMENT COMMUNICATIONS WITH PLAINTIFF

28.   Some four months after Monarch's investment, in early March 2014, the new WMC clinic (located at 5510 South Interstate 35 in South Austin, Texas) had a soft opening. Not long after this opening, Lorenzana Jr. called a meeting with Garg and others to discuss WMC's financial status.  The meeting was held around mid-March at the WMC clinic and was attended by Lorenzana Jr., the Aurrecoecheas, Martinez, Cadena and Aguirre. At that meeting, Lorenzana Jr. advised Garg for the first time that there was no other $300,000 investor (as he had falsely represented prior to Monarch's investment), and that they (Lorenzana Jr. and the others in attendance) requested Monarch to make an additional $300,000 investment to bolster WMC's business operations (specifically for previously unbudgeted marketing efforts).

29.   Garg was troubled by the disclosure that he was the sole source of WMC's funding, and he questioned Lorenzana Jr. about the promoters' deliberate concealment of this critical information.  In response, Lorenzana Jr. claimed that the promoters thought (contrary to their October statements to Garg) that WMC could manage without this additional $300,000 investment and they simply did not tell Garg earlier.  Their motivation for withholding this material information is now clear:  the promoters did not want Monarch to seek to withdraw its investment, and by concealing this information until WMC opened for business, when the bulk of this investment had been dissipated, they were able to effectively avoid such a demand for rescission.  In this same meeting, the promoters told Garg that WMC was doing much better

---

[6]     As set forth in the executed Acquisition Agreement, the other owners of WMC included the following: Fernando Aurrecoechea (15%), Lorenzana Jr. (15%), Cadena, Alejandro Aurrecoechea and Aguirre (at 10% each) and an unnamed private trust (at 5%).

than forecast (which was not true), and thereby further attempted to assuage Garg's concerns about Monarch being the sole investor.  Ultimately, Garg concluded that rescission was not a viable option, and that his best mitigation option (especially since the new clinic had opened) was to acquiesce in the promoters' request to allow the clinic to continue its ostensibly successful operations.  However, he declined to make any additional investment at the time, and decided to await the anticipated official grand opening of the WMC clinic (planned for early June 2014).

30.     The new WMC clinic grand opening occurred on June 6, 2014, and Garg attended.  During that event, Garg inquired of Fernando Aurrecoechea and Martinez if WMC still needed the additional investment funds, and was told that WMC had no immediate funding needs.

### E.     PLAINTIFF'S DISCOVERY OF THE FRAUDULENT SCHEME AND MISAPPROPRIATION OF WMC'S ASSETS

31.     Between the soft opening in March 2014 and late July 2014, WMC's promoters had shared little detail concerning WMC's business operations and financial status.  In late July 2014, Garg began to inquire in more detail about the status of WMC's operations and finances, including business activities since WMC's inception, WMC's current personnel and personnel changes, and insisted on reviewing WMC's financial and bank statements.  In addition, he again asked for a copy of WMC's Operating Agreement (which he still had not seen), and finally received a copy of what purported to be that agreement in late July.  Unbeknownst to Garg (and to his eventual surprise), the version of the Operating Agreement he was provided stipulated that Monarch's 35% ownership interest in WMC carried no voting rights.

32.     The results of Garg's investigations into WMC's books, records and business affairs were alarming:  Lorenzana, Jr., the Aurrecoecheas and other Defendants had almost

completely squandered and misappropriated Monarch's investment for their personal gain over the past ten months.  Of the $900,000 initial investment, less than $100,000 remained.  During the months since Monarch's initial investment, WMC had failed to generate *any* meaningful revenue (much less the $1.3 million projected for first year operations, which they had represented were being exceeded).  WMC had no paying clients, no meaningful opportunities and nominal assets.  In addition, Monarch now knows:

- Lorenzana Jr. had orchestrated various payments from WMC to his law firm (the Lorenzana Firm) for unauthorized expenses unrelated to WMC's business operations (including one for a purported construction loan);

- Lorenzana Jr. and the Aurrecoecheas had authorized and paid Martinez an undisclosed commission of $18,000 for Monarch's investment;

- Aguirre, Alejandro Aurrecoechea, and Cadena had siphoned WMC's funds and paid themselves (through WMC's management company) salaries far in excess of those represented as part of the Business Plan.  They had also hired Ms. Cadena (Cadena's wife) as an office manager (a position not disclosed in the Business Plan).  In addition, Fernando Aurrecoechea generated a substantial salary from WMC (again through a position not disclosed in the Business Plan);

- WMC's various officers (Lorenzana Jr., Aguirre, Alejandro Aurrecoechea, and Cadena) had also (1) hired and paid (with WMC funds) various medical professionals' salaries (including a doctor and other medical professionals) despite the fact that WMC had never procured and retained any paying patients,[7] and (2) used WMC's funds for various expenses unrelated to WMC's business activities;

- Neither Dr. Lorenzana nor Lorenco made any meaningful contribution to WMC; and

- WMC has no collateral or personal guarantees to support WMC's business operations.

In short, upon review of WMC's financial books and records, Monarch discovered that Lorenzana, Jr., the Aurrecoecheas and their co-conspirators had engaged in scheme to pilfer

---

[7]     Although WMC procured six "worker's compensation" patients during the six month period of its business operations, and WMC apparently rendered medical services to these patients, upon information and belief, none of these patients were authorized as eligible employees for receipt of worker's compensation benefits by the Department of Labor.  As such, WMC did not receive any payment for the services rendered to these patients.

Monarch's investment through embezzlement and self-dealing.   In addition, Monarch discovered that the following statements in the Business Plan were false when made (prior to its investment in WMC): (1) WMC was not an existing business, (2) the only apparent affiliation between Dr. Lorenzana and Lorenco and WMC was to lend their names to the promotional efforts to induce Monarch's investment, rather than actively participate in WMC's success, (3) the salaries and positions listed in the Personnel Plan of the Business Plan were false, and (4) WMC was not backed by any relevant personal guarantees or collateral.

F.    THE STATE COURT LAWSUIT

33.    As his investigation was unfolding, but before the extent to which he had been defrauded was fully developed, in early August 2014, Garg expressed his growing concerns to Lorenzana Jr.  Lorenzana, Jr. blamed the Aurrecoecheas and the Cadenas for the dissipation of Monarch's investment, and advised Garg that the best way for Monarch to mitigate its losses was by exercising their collective majority ownership of WMC to take control of it before the dwindling balance of Monarch's investment was completely dissipated, and oust the Aurrecoecheas and the Cadenas from control.  Specifically, Lorenzana Jr. proposed a voting alignment with Monarch, himself, and Aguirre.  Lorenzana Jr. and Sartan (who was Lorenzana Jr.'s law partner in L&S) also promised that Sartan individually would invest $300,000 in WMC once the ouster was complete (to preserve its supposed going concern value—which Garg now realizes was illusory–and save WMC from insolvency), and that they and their law firms would provide all the legal services needed by Monarch and the others to implement and defend the ouster strategy.

34.    Garg reluctantly accepted this proposal because he viewed it as his best immediate hope to influence the control of WMC and mitigate its ongoing losses.  In making

this proposal, Lorenzana Jr. failed to disclose that the Operating Agreement (believed to be authored by him) was structured so that Monarch did not have any voting rights.

35.     Lorenzana Jr. drafted the corporate restructuring document to facilitate the attempted ouster (through a purported amendment to the Operating Agreement) and Monarch and Aquirre signed it.  In response to the attempted management change, the Aurrecoecheas and Cadena filed a declaratory judgment action in Travis County District Court (the "State Court Lawsuit") against Lorenzana Jr. and Aguirre to prevent their ouster, pretending that they were unaware that Lorenzana Jr., his affiliates and Aguirre had been misappropriating WMC's funds.

36.     In response, Lorenzana Jr. filed pleadings on behalf of Monarch and Garg intervening in the State Court Lawsuit and asserting claims against the plaintiffs.  In that action, Lorenzana Jr. represented Monarch, Garg, Aguirre, L&S, Sarhan, and himself, never disclosing or discussing the obvious conflicts between Monarch and Garg and his other clients.  This lawsuit was largely a ruse and a preemptive attempt at "finger pointing" to deflect attention from the wrongdoing of the parties other than Garg and Monarch.  All of the defendants in this lawsuit (individually and collectively) are responsible for defrauding Monarch.[8]

G.     LEGAL MALPRACTICE IN CONNECTION WITH THE STATE COURT LAWSUIT

37.     As noted above, Lorenzana Jr., the Lorenzana Firm, L&S and Sarhan (collectively, the "Law Firm Defendants") represented Garg and Monarch in connection with the attempted takeover efforts in August 2014 and the resulting State Court Lawsuit.  Sarhan (who is not licensed to practice law in Texas yet is a director of L&S and holds himself out as providing legal services to the public) provided legal advice and assistance to Garg and Monarch along with Lorenzana Jr. in connection with the State Court Lawsuit.  As such an

---

[8]     Garg and Monarch have since non-suited their claims in the State Court Lawsuit and are no longer parties.

attorney-client relationship existed between the Plaintiff and the Law Firm Defendants.  The Law Firm Defendants engaged in professional malpractice by, among other things, (1) failing to disclose, advise and obtain informed consent for, the various actual conflicts of interest arising from their prior representation of WMC, the Aurrecoecheas (and possibly others involved in the initial WMC investment offering) and their joint representation of the various parties in the State Court Lawsuit, (2) failing to disclose their own self-interests in the events underlying the facts and circumstances Plaintiff's investment and the underlying the State Court Lawsuit, including, without limitation, their misappropriation of WMC's funds, and (3) failing to advise about the various legal consequences and significance of these conflict and self-interest issues (including the need to seek independent and separate counsel).

## IV.  PLAINTIFF'S CLAIMS

### A.  FEDERAL SECURITIES ACT VIOLATIONS (AGAINST LORENZANA JR., THE AURRECOECHEAS, MARTINEZ AND TERC)

#### 1.  *Violations of Section 17(a) of the Securities Act.*

38.  Lorenzana Jr., the Aurrecoecheas, Martinez and TERC (the "Seller Defendants") each violated Section 17(a)(1), (2) and (3) of the Securities Act (15 U.S.C. §77q(a)(1), (2) & (3)).

39.    The Seller Defendants, directly or indirectly, singly, in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have (a) employed devices, schemes or artifices to defraud, (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary  to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in

transactions, practices or courses of business which operate or would operate as a fraud or deceit.

40.     The Seller Defendants engaged in the above-referenced conduct intentionally, knowingly or with severe recklessness.  They were also negligent in their actions regarding the representations and omissions alleged herein.

41.     Monarch justifiably relied on these defendants' misrepresentations or omissions of material fact, and such defendants' conduct caused Monarch the damages sought in this lawsuit.

2.     ***Violation of Section 10(b) of the Exchange Act and Rule 10(b)(5).***

42.     The Seller Defendants each violated Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5).

43.     The Seller Defendants directly or indirectly, singly or in concert with others, in connection with the purchase or sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes or artifices to defraud, (b) made untrue statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiff.

44.     These defendants engaged in the above-referenced conduct intentionally, knowingly or with severe recklessness.  They were also negligent in their actions regarding the representations and omissions alleged herein.

45.     Monarch justifiably relied on these defendants' misrepresentations or omissions of material fact, and such defendants' conduct caused Monarch the damages sought in this lawsuit.

### 3. *Damages Sought*

46.     As a result of these violations, Plaintiff seeks disgorgement of an amount equal to the invested funds and the benefits the Seller Defendants obtained illegally (in the amount of $900,000), plus pre-judgment interest and any civil penalties available to them under the law.

## B. TEXAS SECURITIES ACT VIOLATIONS (AGAINST LORENZANA JR., THE AURRECOECHEAS, MARTINEZ AND TERC)

47.     The Seller Defendants promoted, offered and sold membership interests in WMC to Plaintiff.  Such membership interests constituted securities within the meaning of the Texas Securities Act.  By reason of their misrepresentations and nondisclosures set forth above, these defendants offered and sold securities to Plaintiff by means of untrue statements and omissions of material facts, and Plaintiff would not have entered into the securities transaction but for such statements.  In light of the foregoing, these defendants are jointly and severally liable for such violations because they constitute a seller, a control person or an aider of a seller under Section 33 of the Texas Securities Act.

48.     As a result of these violations, Plaintiff seeks rescission of the Acquisition Agreement and return of the $900,000 investment (plus interest), or alternatively, actual damages in the same amount (plus interest).  Plaintiff also seeks recovery under the Texas Securities Act for its reasonable and necessary attorneys' fees incurred in prosecuting this action.

C.    **STATUTORY FRAUD UNDER SECTION 27.01 OF THE BUSINESS AND COMMERCE CODE (AGAINST LORENZANA JR., THE AURRECOECHEAS AND TERC)**

49.    As set forth in detail above, The Seller Defendants offered to sell membership interests in WMC.  During this transaction, these defendants made false representations of fact, false promises or benefitted by not disclosing that a third-party's representations or promises were false, and these false representations or promises were made for the purpose of inducing Plaintiff to enter into the Acquisition Agreement.  Plaintiff relied on these false representations or promises in entering into the Acquisition Agreement, and such reliance caused them injury.

50.    As a result of this fraud, Plaintiff seeks rescission of the Acquisition Agreement and return of the $900,000 investment (plus interest), or alternatively, actual damages in the same amount (plus interest), and exemplary damages.  Plaintiff also seeks recovery under Section 27 of the Business and Commerce Code of its reasonable and necessary attorneys' fees and costs incurred in prosecuting this action.

D.    **COMMON LAW FRAUD (AGAINST (AGAINST LORENZANA JR., THE AURRECOECHEAS AND TERC)**

51.    As set forth in detail above, the Seller Defendants made materially false representations to Plaintiff (either knowingly or recklessly) with the intent that Plaintiff would act on them by investing $900,000 in WMC through the purchase of WMC membership interests.  Additionally, these defendants (1) concealed from or failed to disclose certain material facts to Plaintiff that defendants had a duty to disclose (and indeed were deliberately silent when they had a duty to speak), or (2) made partial disclosures to Plaintiff about material facts that created a substantially false impression.  These defendants knew Plaintiff was ignorant of the undisclosed facts and Plaintiff did not have an equal opportunity to discover those facts.

Plaintiff justifiably relied on these false representations, promises or nondisclosures in entering into the Acquisition Agreement, and such reliance caused it injury.

52.     As a result of this fraud, Plaintiff seeks rescission of the Acquisition Agreement and return of the $900,000 investment (plus interest), or alternatively, actual damages in the same amount (plus interest), and exemplary damages.

## E.   CIVIL CONSPIRACY AND AIDING AND ABETTING LIABILITY (AGAINST AGUIRRE, THE CADENAS, DR. LORENZANA, LORENCO AND UPG)

53.     Aguirre, the Cadenas, Dr. Lorenzana, Lorenco and UPG (the "Co-conspirators") worked together and were members of a combination with the Seller Defendants in connection with the illegal conduct referenced above.  The object of this combination was to accomplish an unlawful purpose or a lawful purpose by unlawful means.   The Co-Conspirators and the Seller Defendants had a meeting of the minds on the object or course of action, and one of the members of this combination committed an unlawful, overt act to further the object or course of action (i.e. fraud in the offering and sale of the WMC membership interests to Plaintiff). Plaintiff suffered injury as a proximate result of the wrongful act, and the Co-conspirators are each liable, jointly and severally, for the wrongful conduct of the Seller Defendants as members of the unlawful civil conspiracy.

54.     Alternatively, the Co-Conspirators aided and abetted the wrongful conduct of the Seller Defendants.  Specifically, the Co-Conspirators had knowledge that the Seller Defendants' conduct constitutes wrongful conduct, the Co-Conspirators had the intent to assist the Seller Defendants in committing this conduct, and they gave the Seller Defendants assistance or encouragement that was a substantial factor in causing the wrongful conduct.  Plaintiff suffered injury as a proximate result of this aiding and abetting, and the Co-conspirators are each liable, jointly and severally, for the wrongful conduct of the Seller Defendants.

**F.      FIRST DERIVATIVE CLAIM: BREACH OF FIDUCIARY DUTY (AGAINST LORENAZNA JR, THE AURRECOECHEAS, AGUIRRE, THE CADENAS)**

55.      Monarch fairly and adequately represents the interests of WMC and similarly situated members in enforcing the rights of WMC. Making demand upon the company to take action is excused because it would be futile in this instance since WMC's officers and managers (including Lorenzana Jr. and others) have either engaged in the fiduciary and other legal duty breaches described herein or have acquiesced in (if not encouraged) these breaches in blatant derogation of their fiduciary responsibilities.  In light of these allegations, Lorenzana Jr. (as manager) and the other corporate officers are not disinterested (i.e. they are incapable of making an impartial decision) and not independent, and the challenged transactions referred to above were made in bad faith.

56.      As corporate officers or employees of WMC, Lorenzana Jr., the Aurrecoecheas, Aguirre and the Cadenas owed fiduciary duties to WMC, including the duty of loyalty, utmost good faith and candor, duty to refrain from self-dealing, duty to act with integrity of the strictest kind, duty of fair, honest dealing and the duty of full disclosure.  By misappropriating and wasting the corporate assets of WMC as described above, these defendants violated their fiduciary duties to WMC.  As a result of these duty breaches, WMC (and derivatively Monarch) has suffered injury.

57.      As a result of these duty breaches, Plaintiff (derivatively on WMC's behalf) seeks (1) disgorgement and return of misappropriated and ill-gotten assets and property of WMC, (2) the imposition of a constructive trust on all monies wrongfully misappropriated from WMC, and  (3) its actual and exemplary damages, plus interests and costs.

**G.**    **SECOND DERIVATIVE CLAIM: UNJUST ENRICHMENT AND MONEY HAD AND RECEIVED (AGAINST ALL DEFENDANTS EXCEPT L&S, SARHAN, LORENCO, DR. LORENZANA AND TERC)**

58.    Defendants Lorenzana Jr., the Aurrecoecheas, the Cadenas, Martinez, Aguirre,, the Lorenzana Firm and UPG hold money that belongs to Plaintiff (derivatively on WMC's behalf) in equity and good conscience.  In addition, these defendants have been unjustly enriched to the detriment of Plaintiff (derivatively on WMC's behalf) through their misappropriation and waste of WMC's corporate assets and Plaintiff's $900,000 investment.

59.    As a result of this misconduct, Plaintiff (derivatively on WMC's behalf) seeks (1) disgorgement and return of misappropriated and ill-gotten assets and property of WMC, (2) the imposition of a constructive trust on all monies wrongfully misappropriated from WMC (or property which is traceable to such monies), and (3) its actual and exemplary damages, plus interests and costs.

**H.**    **LEGAL MALPRACTICE (AGAINST THE LAW FIRM DEFENDANTS)**

60.    An attorney-client relationship existed between Lorenzana Jr., the Lorenzana Firm, the L&S and Sartan (the "Law Firm Defendants"), on the one hand, and Plaintiff, on the other hand.  The Law Firm Defendants breached the standard of care owed to Plaintiff by engaging in the actions set forth above, and acted with malice.  As a proximate cause of these negligent acts and omissions, Plaintiff has been injured and seek recovery from the Law Firm Defendants of actual and exemplary damages.

**I.**    **BREACH OF FIDUCIARY DUTY (AGAINST THE LAW FIRM DEFENDANTS)**

61.    The Law Firm Defendants owed fiduciary duties to Plaintiff as its attorneys, including, among other things, the duty of loyalty, utmost good faith, and candor, duty to refrain from self-dealing and duty of full disclosure.  The Law Firm Defendants breached those duties

by, among other things, (1) failing to disclose, advise and obtain informed consent for, the conflicts of interest arising from their prior representation of WMC, the Aurrecoecheas (and possibly others involved in the initial WMC investment offering) and their joint representation of the various parties in the State Court Lawsuit, (2) failing to disclose their own self-interests and self-dealing in the events underlying the facts and circumstances underlying the State Court Lawsuit, including, without limitation, their misappropriation of WMC's funds, and (3) failing to advise about the various legal consequences and significance of these conflicts and self-interest issues (including the need to seek independent and separate counsel).

62.     As a result of these duty breaches, Plaintiff has been injured and seeks recovery from the Law Firm Defendants of actual and exemplary damages.

## V.      CONDITIONS PRECEDENT

63.     All conditions precedent have occurred or have been performed.

## VI.      REQUEST FOR RELIEF

After trial on the foregoing counts, Plaintiff respectfully requests that this Court award the following relief:

1.     Rescission of the Acquisition Agreement and disgorgement of the initial $900,000 investment;

2.     Actual damages in an amount to be determined at trial but beyond the jurisdictional limits of this Court;

3.     Exemplary damages;

4.     Costs of court;

5.     Attorney's fees;

6.     Prejudgment and post-judgment interest; and

7.     Any such other and further relief, in law or in equity, to which Plaintiff may have shown itself to be justly entitled.

Respectfully submitted,

**FRITZ, BYRNE, HEAD & HARRISON, PLLC**
98 San Jacinto Blvd., Suite 2000
Austin, Texas 78701
Telephone:  (512) 476-2020
Telecopier:  (512) 477-5267


By:    /s/ Daniel H. Byrne
         Daniel H. Byrne
         Email:  Dbyrne@fbhh.com
         State Bar No. 03565600
         Kevin W. Brown
         Email:  Kbrown@fbhh.com
         State Bar No. 24045222

ATTORNEYS FOR MONARCH INVESTMENTS, LLC